**SO ORDERED.**

**SIGNED this 20 day of January, 2011.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CAPITAL CORP.,** | **CASE NO. 08-22786-7** |
| | **CHAPTER 7** |
| **DEBTOR.** | |
| **CITIZENS BANK & TRUST CO.,** | |
| **PLAINTIFF,** | |
| v. | **ADV. NO. 08-6132** |
| **ALBERT RIEDERER, et al.,** | |
| **DEFENDANTS.** | |

**OPINION DENYING SUMMARY JUDGMENT**

This proceeding is before the Court on the Plaintiff's motion for summary

judgment. Plaintiff Citizens Bank & Trust Company appears by counsel Mark A.

Shaiken and Misty Watt of Stinson Morrison Hecker LLP. Defendants Security First

Insurance Holdings, LLC, Security First Managers, LLC, and Bank of Kansas appear by counsel David L. Marcus and Ryan A. Kriegshauser of Graves Bartle Marcus & Garrett. Defendants Southern Fidelity Holding, LLC, Southern Fidelity Managing Agency, LLC, Northern Capital, Inc., and Northern Capital Management, Inc., appear by counsel Scott C. Long and John R. Weist of Long & Luder, P.A. The Court has reviewed the relevant materials and is now ready to rule.[1]

Both Citizens and the Defendants claim to have a first priority security interest in certain stock owned by the Debtor but in which the Debtor's subsidiary had a security interest. After the Debtor filed for bankruptcy, the stock was sold, and the proceeds are being held pending the outcome of this proceeding. Citizens obtained its security interest in the stock from the Debtor, and the Defendants claim to have prior rights through the Debtor's subsidiary's security interest and certain agreements they made with the subsidiary. Although it initially asserted other arguments, Citizens now asks for summary judgment on either of alternative grounds: (1) the Defendants' agreements with the Debtor's subsidiary should be characterized as loans to the subsidiary rather than participations in the subsidiary's loan to the Debtor, and when that is done, Citizens' perfected security interest has priority because the Defendants either have no security interests or any security interests they may have were not properly perfected; or (2) the

---

[1]Some defendants have previously been dismissed from this proceeding, and this summary judgment motion addresses claims Citizens has asserted against the rest of the original defendants. However, StoneRidge Capital Advisors has intervened in the proceeding as a defendant, and this summary judgment ruling will not address its claim.

2

Debtor's subsidiary had either actual or apparent authority to subordinate its security interest to Citizens' security interest, it agreed to do so, and the Defendants are bound by that subordination. The Defendants contend that: (1) their agreements with the Debtor's subsidiary are participation agreements, and Citizens has no standing to ask the Court to recharacterize the agreements as loans, the essential basis of its attack on the perfection of their security interests in the stock, and (2) certain documents executed as part of a loan workout arrangement among Citizens, the Debtor, and its subsidiary, including the one Citizens claims subordinated their security interests, are ambiguous, so the parties' intent in agreeing to the arrangement cannot be determined by summary judgment.

After giving the matter due consideration, the Court reaches the following ultimate conclusions. First, Citizens has standing to dispute the validity and perfection of the Defendants' claimed security interests, but it has not established that the Defendants' participation agreements must, as a matter of law, be recharacterized as loans to the Debtor's subsidiary. Second, Citizens has not established that testimony from an attorney who worked for a number of the Brooke companies and was involved in the workout transaction among Citizens, the Debtor, and its subsidiary cannot be believed. Consequently, the attorney's assertion that he told Citizens there were participants with interests in the subsidiary's loan to the Debtor who would not agree to the subordination of the subsidiary's lien in the stock to Citizens' lien raises a genuine issue of material fact that precludes deciding whether Citizens could reasonably have believed the subsidiary was authorized to subordinate its lien. Third, considered together, as required by Kansas

3

law, the workout documents do not unambiguously subordinate the Debtor's subsidiary's lien (and through it, the Defendants' liens) on the stock to Citizens' lien.

### I. Facts as presented for summary judgment purposes

#### A.      Brooke Capital Advisors' transaction with Brooke Capital Corporation.

On December 31, 2007, Brooke Capital Corporation ("the Debtor") signed an agreement with its subsidiary Brooke Capital Advisors, Inc. ("BCA"). The agreement said BCA was loaning the Debtor $12.382[2] million, with a four-year term and an interest rate equal to the "daily Prime Rate as published in the Wall Street Journal plus four and one-half percent." As security for the loan, the Debtor signed a stock pledge and security agreement, giving BCA a security interest in, among other things, all the Debtor's interest in First Life America Corporation ("FLAC"). The Debtor owned all of the outstanding stock of FLAC. Some months later, the FLAC stock certificate could not be located, so FLAC issued a new certificate, dated June 25, 2008, and labeled "Number 18," that showed the Debtor to be the registered owner of just under 1.5 million shares of FLAC. The Defendants contend an attorney took possession of this certificate on behalf of BCA, and for purposes of its summary judgment motion, Citizens now concedes that assertion.

#### B.      Agreements claimed to be participation agreements.

In March 2008, BCA executed three documents labeled "Participation Certificate and Agreement" and one labeled "Participation Agreement." These documents purported

---

[2]In Citizens' Statement of Facts, the amount is stated as $12,383,000, and the Defendants did not dispute the amount. However, the loan agreement Citizens submitted in support of its motion says the amount is $12,382,000.

to sell to defendants Northern Capital, Inc., Southern Fidelity Managing Agency, Security First Insurance Holdings, LLC, and Bank of Kansas (through a predecessor)[3] fractional interests called "participations" in BCA's loan to the Debtor; the fractional interests covered by the documents add up to 86.87%, leaving BCA with a 13.13% share of its loan to the Debtor. The documents note that the collateral for BCA's secured loan to the Debtor included the FLAC stock. None of the purported buyers under these agreements filed a Uniform Commercial Code financing statement concerning the interest it received under its agreement. One of the claims Citizens is continuing to pursue through summary judgment is that these agreements are not true participations, but instead are disguised loans to BCA.

1.      ***"Participation Certificate and Agreements" held by Northern Capital, Southern Fidelity Managing Agency, and Security First Insurance Holdings.***

The documents called "Participation Certificate and Agreement" ("Certificates") were executed on what appear to be identical two-page forms. They state that BCA was selling to three "Purchasers," without recourse to BCA, shares of its loan to the Debtor. BCA transferred (1) 8.07% to Northern Capital, Inc., for $1 million; (2) 40.4% to

---

[3]As indicated in the first paragraph of this opinion, several other Defendants have joined these four in opposing Citizens' motion for summary judgment. The parties have not explained what interests these other Defendants have in this dispute, but their names suggest each of them is somehow affiliated with one of the Defendants whose interests arose from the documents discussed in the text. The fact these other Defendants are opposing Citizens' motion has not affected the Court's ruling.

Security First Insurance Holdings, LLC,[4] for $5 million; and (3) 24.22% to Southern Fidelity Managing Agency for $3 million.[5]  Each of these Certificates included a section labeled "Loan Background Information" that described BCA's loan to the Debtor.  The last part of this section provided space for "Additional information.  (Describe)" into which the following had been added, "Seller agrees to repurchase Purchaser's interest on or before June 30, 2008."  The Court notes this provision does not specify whether the Seller was obliged to make up any unpaid interest that might have accrued on the underlying loan before the repurchase date arrived.  BCA and the three Purchasers all signed addendums (which are similar but differ from one another to some degree) that extended the repurchase date to September 30, 2008.  In a section labeled "2. Sale of Participation," the Certificates contained alternative paragraphs "A. Term Loan," and "B. Draw or Revolving Draw Loan."  A box beside the "A" was marked on each of the Certificates to indicate that option applied, and related blanks were completed to specify the amount the Purchaser was paying and the percent interest of BCA's loan it was buying.  In this context, it is clear the phrase "Term Loan" refers to BCA's loan to the Debtor, and is not describing the Purchaser's transaction with BCA as a term loan.

The Certificates called for BCA to share any payments the Debtor made on its loan

---

[4]The original document identified the "Purchaser" as "Security First Holdings, LLC," but the parties later amended the name to "Security First Insurances Holdings, LLC."

[5]The Court notes the Participation Certificate and Agreements all state the amount of the loan to the Debtor was $12,385,000.  The percentage shares stated in the documents would be essentially the same whether the loan amount was $12.382 million or $12.385 million.

6

pro rata with the Purchasers. They also provided that BCA's loan to the Debtor was secured by, among other things, the FLAC stock, and that BCA was assigning a proportionate share of its security interests to each Purchaser and would hold those shares for their benefit. The Purchasers' interest rates were set as the "Wall Street prime lending rate plus 4.5%, adjusting daily as index adjusts"; though the description of the base rate is phrased a bit differently, this is probably the same as the interest rate on the underlying loan. There were to be no shared borrower fees, expenses to protect the loan and collateral (such as advances to pay taxes or insurance, attorney fees, and court costs), or administrative fees (charges for servicing the loan); BCA was entitled to keep all borrower fees and obliged to pay all expenses and servicing costs. The agreements provided that BCA would administer the Debtor's loan as though it were the sole owner and would use the same degree of care in servicing and collecting the loan as it would for its own accounts. BCA was required to get the Purchasers' written consent (1) to reduce the loan principal or interest, (2) to release or allow substitution of the property securing the loan, (3) to renew, extend, or modify the loan provisions, or (4) to waive any claim against the Debtor. In the event the Debtor defaulted or BCA otherwise accelerated and liquidated the loan, any money BCA recovered was to be applied to expenses, then to unpaid principal owed at the time of default in proportion to the investments of BCA and the Purchasers in the loan, and then to their accrued interest and other charges.

### 2. *"Participation Agreement" held by Bank of Kansas.*

The thirteen-page Participation Agreement ("Agreement") is very different from

7

the Certificates in form, although it contains many similar provisions. It states that BCA was selling to First National Bank of Johnson County, the predecessor to Defendant Bank of Kansas, a 14.54% share of its loan to the Debtor for $1.8 million. The Agreement does not state whether the transfer was with or without recourse to BCA. Unlike the Certificates, this Agreement contained no provision obligating BCA to repurchase the Purchaser's interest at any time. The first paragraph of the Agreement identified BCA as the originating lender and First National Bank as a participating lender or "Purchaser," but had a space for another participating lender identified as "Lead Bank" that was left blank. Section 3 of the Agreement is labeled "Sale of Participation" and the first paragraph of the section reads: "**3.1 Term Loan.** In consideration of the sum of $1,800,000.00, Seller hereby sells and certifies to Purchaser an undivided 14.54 percent interest (Share) in the Principal and interest hereafter accruing from the Loan."

The Agreement said in the event the Debtor defaulted on its loan, the Lead Bank was to assume administrative responsibilities for the loan and the participating lenders. The Agreement recited the interest rate provided by the Debtor's loan, but said the Purchaser's interest rate would vary based on the "Daily Prime Lending Rate as published in the Wall Street Journal plus two percent"; the description of the base rate is phrased a bit differently, but is probably the same as the base rate on the underlying loan, although the adjustment to the rate is two and a half percent less. BCA was to receive the Debtor's payments and to pay the Purchaser its pro rata share. The Purchaser was to pay its pro rata share of loan expenses incurred to protect the loan and collateral (such as taxes,

8

insurance, attorney fees, and court costs), and to receive a pro rata share of any borrower fees, but BCA was to bear all the costs of administering and servicing the loan. The Agreement said the collateral for BCA's loan to the Debtor included the FLAC stock, and assigned to the Purchaser a security interest in the collateral "in proportion to each Purchaser's investment and is held by Seller for the benefit of Purchaser." The Agreement provided that BCA would administer the Debtor's loan as though it were the sole owner and would use the same degree of care in servicing and collecting the loan as it would for its own accounts. The Agreement required BCA to get the Purchaser's written consent (1) to reduce the loan principal or interest, (2) to release or allow substitution of the property securing the loan, (3) to renew, extend, or modify the loan provisions, or (4) to waive any claim against the Debtor. If the Debtor defaulted, the "Lead Bank" was to assume administration of the loan, collect from the Debtor, and apply all collections to expenses, then to the unpaid principal owed at the time of default in proportion to the unpaid investments in the loan of BCA and the Purchaser, and then to their accrued interest and other charges. Since no "Lead Bank" was identified in the Agreement, it is unknown which party, BCA or the Purchaser, would have assumed these obligations.

### C. *Citizens' transaction with the Debtor and BCA*

#### 1. *Original loan and Debtor's default.*

On December 31, 2007, Citizens loaned $9 million to the Debtor, secured by stock in affiliates of the Debtor, but not by the FLAC stock. The Debtor soon defaulted on the

9

loan, and the parties began workout discussions. Citizens asked if the Debtor could pledge the FLAC stock and if BCA would consent to such a pledge and agree to subordinate its lien, and claims it was told both could be done. However, the Defendants respond that Citizens was told these things in connection with a proposed plan to pay Citizens with the proceeds of the FLAC stock and substitute stock in another company to secure BCA's loan to the Debtor, but that the plan was never completed because the stock in both companies declined in value. They contend Citizens was later told third parties were participants in BCA's loan to the Debtor, and they would not agree to allow BCA to subordinate its lien in the FLAC stock. Citizens did a UCC search that revealed no filed financing statement in which a creditor of the Debtor claimed an interest in the FLAC stock.

### 2. *Relevant workout documents*

Around the last week of June in 2008, Citizens, the Debtor, and BCA executed a number of documents as a result of their workout discussions, only three of which are relevant here. First, the Debtor signed an agreement giving Citizens a security interest in all its personal property; this would include its FLAC stock. On June 25, 2008, Citizens filed a UCC-1 financing statement in an effort to perfect that security interest. Both the Debtor and BCA signed a second document that Citizens argues subordinated BCA's lien — and therefore the Defendants' liens — on the FLAC stock to Citizens' lien. The Debtor, BCA, and Citizens all signed a third document that the Defendants argue conflicts with the construction Citizens offers of the second document.

10

The second document, dated June 25, 2008, is in the form of a letter from the Debtor and BCA to Citizens, although it was actually drafted by an attorney for Citizens. The document identifies its subject as, "Re: Payment Agreement." The operative sentence that Citizens relies on reads: "If, in connection with any sale or other disposition of any equity interests or assets of FLAC, [either the Debtor or BCA] is entitled to receive, directly or indirectly, any proceeds from such sale or disposition, [that company] shall immediately pay such proceeds to [Citizens] to the extent necessary to satisfy [the Debtor's debt to Citizens]." The copy provided to the Court is signed only by a representative of BCA, and there is no date written by the signature. This document will be referred to as "the Payment Agreement."

The third document says in its first sentence that it is "dated as of June 25, 2008," but all the signatures on its fifth page are dated June 30, 2008. It also addresses the FLAC stock, and is titled "Escrow Agreement." The document identifies the Debtor as the "Pledgor," BCA as "First Lien Lender," and Citizens as "Second Lien Lender." It says the Debtor had previously given BCA "a first priority security interest in 100% of all of the common stock" of FLAC to secure its debt to BCA, and that the Debtor had delivered to BCA certificate number 18, representing almost 1.5 million shares of FLAC common stock. The document then says, "Pledgor has, with First Lien Lender's consent, granted to Second Lien Lender a second priority security interest in the [FLAC common stock]." The document goes on to say that BCA and Citizens agreed the FLAC certificate would be held by a third-party escrow agent in order to perfect both their security

11

interests in the stock. The document advised the escrow agent to follow BCA's written instructions about the stock until the Debtor's obligations to BCA, as defined in its agreement pledging the FLAC stock to BCA, were satisfied in full. Then, when BCA notified the agent and Citizens that the obligations had been paid in full, the agent was to deliver the certificate to Citizens. This document will be referred to as the "Escrow Agreement."[6]

The exhibits that Citizens submitted to support its motion include an e-mail exchange that took place on June 25 and 26, 2008, between (1) an attorney who was general counsel to and an officer of at least several of the Brooke family of companies, and (2) the attorney for Citizens who drafted the Payment Agreement.[7] In a message dated June 25, the Brooke attorney said, "I am holding the FLAC certificates on behalf of [BCA], the first lienholder. . . . Let me know if you would like to follow through on a second lien on those shares." The next day, Citizens' attorney responded, expressing concern that the Brooke attorney might be viewed as an agent of the Debtor whose possession would not perfect security interests in the stock and suggesting, "Could the bank take possession of the FLAC stock certificates, with an agreement that the bank also holds for [BCA] who has a first lien on x shares?" In reply, the Brooke attorney wrote, "The loan participants on the [BCA] loan would object to Citizens holding the FLAC

_____

[6]The Court notes the Payment Agreement contains a choice of law provision saying it should be governed by Missouri law, while the Escrow Agreement says it is governed by Kansas law. The parties have cited only Kansas law on the questions presented, though, and the Court will follow their lead.

[7]Exhibit 14 to Citizens' Statement of Facts, entered as docket no. 167-23.

shares. . . . I propose that an independent third party, a title / escrow company . . . hold the shares for the first and second lienholder." The Brooke attorney also testified in a deposition that he believed the Defendants' interests in the FLAC stock were superior to Citizens' lien on the stock.

## II. Discussion

### A. Summary judgment rules

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[8] The substantive law identifies which facts are material.[9] A dispute over a material fact is genuine when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the party opposing the motion.[10] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes, but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[11] at which the Court would act in its factfinding role. Summary judgment is inappropriate if an inference can be drawn from

---

[8]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[9]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10]*Id.*

[11]*Id.* at 249-50.

13

the materials properly submitted either to support or oppose the motion that would allow the non-moving party to prevail at trial.[12]

The substantive law's allocation of the burden of proof also affects the Court's analysis of a summary judgment motion. The party asking for summary judgment has the initial burden of showing that no genuine issue of material fact exists.[13] But if the moving party does not have the burden of proof on a question, this showing requires only pointing out to the Court that the other party does not have sufficient evidence to support a finding in that party's favor on that question.[14] When such a showing is made, the party with the burden of proof must respond with affidavits, depositions, answers to interrogatories, or admissions sufficient to establish that a finding on the question could properly be made in the party's favor at trial.[15]

### B. Citizens' Remaining Issues

Although Citizens had previously raised other issues, in its reply to the Defendants' memoranda opposing its summary judgment motion, Citizens says there are only three issues the Court should now resolve:

1. "Are the participants [Defendants] creditors of BCA or did they purchase an actual interest in the BCA Loan;

---

[12]*See id.* at 248.

[13]*Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

[14]*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[15]*Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

14

2.      "Did BCA have the ability to sign the Payment Agreement and Escrow

        Agreement; and

3.      "Is there anything at all that is ambiguous about the Payment Agreement and the

        Escrow Agreement."

As explained below, the Court concludes Citizens has not established that it is entitled to

summary judgment on any of these questions.

> **C.      Citizens has not established for purposes of summary judgment that the**
>
> **three Certificates and the Agreement must be recharacterized as loans to**
>
> **BCA rather than participations in BCA's loan to the Debtor.**

> **1.      Overview of Citizens' recharacterization argument.**

For its first summary judgment claim, Citizens argues the Court should ignore the

fact the parties called the Defendants' transactions with BCA sales of participations in

BCA's loan to the Debtor, and treat them instead as mere loans to BCA.  Then, claiming

the Defendants' agreements with BCA do not explicitly grant any of them a security

interest in the FLAC stock, Citizens argues they have no security interests in it.  Even if

they have security interests in the stock, Citizens continues, those security interests are

unperfected and cannot have priority over Citizens' security interest, which was perfected

either by the financing statement it filed on June 25, 2008, or by the deposit of the stock

into escrow under the Escrow Agreement.

> **2.      The Defendants' standing argument is rejected.**

The Defendants all respond that Citizens has no standing to seek recharacterization

15

of their transactions with BCA.  The Defendants cite no authority supporting this

argument.  The Court believes in priority disputes among secured creditors, each creditor

can ordinarily question any other creditor's assertion of a perfected security interest, and

will not deny Citizens' recharacterization claim on this ground without some authority

explaining why this is not such an ordinary priority dispute.

### 3.    *Perfecting security interests in certificated securities.*

The Court notes that the financing statement Citizens filed on June 25, 2008,

would have perfected its security interest in the FLAC stock for some purposes.

However, at least once certificate number 18 was issued for the stock, the stock became a

"certificated security" under the Kansas UCC.[16]  A creditor who perfects a security

interest in a certificated security by filing loses its priority to a creditor who obtains

control of the security before the filing creditor does.[17]  The Escrow Agreement says that

"as of June 25, 2008," the Debtor had delivered the stock certificate to BCA, which

would have given BCA control of the stock and given its lien priority over Citizens'

perfection by filing.  This would be true even if the stock was delivered after Citizens

filed its financing statement.[18]  Then, when the stock was delivered to the escrow agent

---

[16]*See* K.S.A. 2009 Supp. 84-8-102(4) (defining "certificated security") and -102(15) (defining "security").

[17]*See* K.S.A. 2009 Supp. 84-8-106 (specifying requirements for "control"); K.S.A. 2009 Supp. 84-9-106(a) (adopting 84-8-106 requirements for "control" under UCC Article 9); K.S.A. 2009 Supp. 84-9-328(1) and (2) (secured party having control of security has priority over secured party that does not have control).

[18]K.S.A. 2009 Supp. 84-9-328 (perfection by control gives priority over other forms of perfection).

16

under the Escrow Agreement, BCA's continued perfection by control would have priority over Citizens' new perfection by control.[19]

### 4. *The repurchase obligation does not mandate recharacterizing the Certificates.*

Citizens relies on two main authorities to support its claim that BCA's obligation to repurchase the Purchasers' interests in the Certificates makes those arrangements loans to BCA, rather than participations in BCA's loan to the Debtor. First, in its brief replying to the Defendants' responses to its summary judgment motion, Citizens cites a document issued by the Financial Accounting Standards Board ten years ago.[20] Citizens contends this document establishes, as a matter of law, that BCA's obligation to repurchase the interests transferred to three of the Defendants through the Certificates means those Defendants merely loaned money to BCA, took no security interest in any BCA asset, did not perfect any security interest, and therefore are merely unsecured creditors of BCA.

The FASB standard does seem to state that for financial accounting purposes, BCA's repurchase obligation means its transfers under the Certificates are not to be accounted for as sales in its books. However, the standard does not say the transferees in such transactions must be treated for accounting purposes as unsecured creditors of the

---

[19]K.S.A. 2009 Supp. 84-9-328(2)(A) (if collateral is a security, conflicting security interests rank according to priority in time of obtaining control).

[20]Dkt. no. 185 at 2, citing attached Exhibit A, "Statement of Financial Accounting Standards No. 140," issued by the Financial Accounting Standards Board of the Financial Accounting Foundation (Sept. 2000).

transferor. Furthermore, Citizens cites nothing showing that this FASB standard

establishes the legal standard for determining what the three Defendants received from

BCA. The Court believes a provision in the Kansas UCC, K.S.A. 2009 Supp. 84-9-

102(72), establishes that those Defendants received at least a security interest from BCA.

The statute defines "security agreement" to mean "an agreement that creates or provides

for a security interest." Even if the Certificates did not effectively sell loan participations

to the three Defendants, they clearly "provid[ed] for" transfers to them of shares of, or

perhaps security interests in, BCA's security interests in the collateral securing the loan to

the Debtor. The FASB standard provides no basis to override the UCC's directive to treat

each Certificate as an "agreement . . . provid[ing] for a security interest," which gave

those three Defendants at least shares of or security interests in BCA's security interest in

the Debtor's property.

As the second ground of support for its recharacterization argument, Citizens cites

several cases discussing participation agreements and efforts to have them determined to

be disguised loans,[21] relying most heavily on *In re Coronet Capital Company*.[22]  In that

---

[21]*Bayer Corp. v. Masco Tech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 735-40 (6th Cir. 2001) (creditor of bankruptcy estate claimed other creditors' participation agreements were disguised loans; participation agreements held to be true participations); *Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.)*, 813 F.2d 266, 270-72 (9th Cir. 1987) (bankruptcy trustee succeeded on claim "participations" were disguised loans to debtor rather than sales of interests in underlying loans, so all lender interests in underlying loans were property of bankruptcy estate); *In re Yale Express System, Inc.*, 245 F.Supp. 790, 791-92 (S.D.N.Y. 1965) (bank that participated in loan to debtor sought to set off money in debtor's account at the bank against loan participation interest; court held participation interest did not make bank a creditor of debtor, so account could not be set off against participation interest); *European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 931-35 (Bankr. S.D.N.Y. 1993) (bankrupt debtor-"seller" defeated "buyer's" request for summary judgment determination that transaction was sale of participation, not a loan); *In re Coronet Capital Co.*,

18

case, a company that had obtained 90% of the debtor's interest in a mortgage that secured a loan the debtor had made to a third party sought stay relief, and the Chapter 7 trustee objected, arguing the transaction was a loan to the debtor, not a sale of a participation interest, so the entire mortgage was property of the bankruptcy estate. The question the court had to decide was whether the 90% interest was excluded from the estate by § 541(d), which provides that property in which the debtor holds

> only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The *Coronet* court identified various factors that show a transaction is a loan rather than a sale of a participation interest:

> A typical loan participation transaction involves a lead lender who retains some interest in the transaction, retains possession of the note, and retains the power to enforce against the mortgagor. *Fireman's Fund Insurance Cos. v. William B. Grover (In re The Woodson Company)*, 813 F.2d 266, 270 (9th Cir. 1987). The relationship between a lead lender and a participant is characterized as debtor and creditor if the participation is in fact a loan. The factors indicating an intention to create a loan instead of a participation include: 1) guarantee of repayment by the lead lender to a participant; 2) participation that lasts for a shorter or longer term than the underlying obligation; 3) different payment arrangements between borrower and lead lender and lead lender and participant; and, 4) discrepancy between the interest rate due on the underlying note and interest rate specified in the participation. Hutchins, *What exactly is a Loan Participation?*, 9 Rut.

---

142 B.R. 78 (Bankr. S.D.N.Y. 1992) (bankruptcy trustee successfully argued participation was loan, not sale, so all lender interests in underlying loan were property of bankruptcy estate); *cf. First Bank of Wakeeney v. Peoples State Bank*, 12 Kan.App.2d 788 (1988) (suit between parties to participation agreements; no recharacterization sought). The Court has reviewed one other case which involved a bankruptcy trustee's effort to have a debtor's transaction recharacterized as a loan. *Bear v. Coben (In re Golden Plan of California, Inc.)*, 829 F.2d 705, 708-11 (9th Cir. 1987) (rejecting trustee's claim, Ninth Circuit held transaction was outright sale, not disguised loan).

[22]142 B.R. 78 (Bankr. S.D.N.Y. 1992).

Cam. L.J. 447, 460 (1978).[23]

Agreeing with the trustee, the bankruptcy court ruled the purported sale of the interest in the mortgage was, in substance, a mere loan because the debtor was obliged to and did pay interest to the "buyer" even when the mortgage-borrower was in default, and at maturity, the "buyer" was entitled to be paid its principal and interest before the debtor could retain any of its share of the loan, so the entire mortgage-lender interest was property of the debtor's estate.[24]

In the case before this Court, BCA retained 13.13% of its loan to the Debtor, retained possession of the Debtor's note, and retained the power to enforce the loan terms against the Debtor,[25] so the transactions had at least some of the characteristics of a true loan participation that the *Coronet* court identified. However, the three Certificates have a provision calling for BCA to repurchase the participation from the Defendant only three months after the creation of the participation arrangement, providing a colorable basis under *Coronet* to recharacterize those agreements.[26] But until the repurchase obligations matured, the Certificates did not require BCA to pay the Defendants (even in the event of a default) except when it received payment from the Debtor, and then only to give them

---

[23]142 B.R. at 80.

[24]142 B.R. at 80-82.

[25]As indicated, if the Debtor defaulted, the Agreement might have transferred the enforcement power to the Bank of Kansas, as the successor to the First National Bank. However, the Agreement only applied to 14.54% of BCA's loan to the Debtor.

[26]It bears repeating that the Agreement contained no repurchase provision.

20

their proportionate share of the payments. As explained below, the Defendants whose interests were created by the Certificates appear to have been subject to at least some of the risk the Debtor might default on the underlying loan, so summary judgment cannot be granted against them on the question whether their transactions with BCA were disguised loans and not true participations.

5. **The facts as presented do not establish that the Agreement now held by Bank of Kansas must be recharacterized as a loan to BCA.**

Citizens argues that under *Coronet*, even the Agreement now held by Defendant Bank of Kansas is not a true participation agreement because it provided interest at a lower rate to the Purchaser than BCA was charging the Debtor, the payment arrangement between the Purchaser and BCA was different than that between BCA and the Debtor, and the Agreement described the Purchaser's advance to BCA as a "Term Loan," citing ¶ 3.1 of the Agreement. However, *Coronet* did not specify how interest rates or payment arrangements had to differ to indicate the transaction was a loan rather than a participation. In *Sackman Mortgage Corporation*, the court explained that in a typical participation agreement, the participant pays the lead lender for administering the loan by a direct fee, an adjustment of the interest, or both.[27] The difference between the interest rate BCA was charging the Debtor and the rate the Purchaser was to be paid under the Agreement could have been intended to compensate BCA for administering the loan. A

---

[27]158 B.R. at 935; *see also Woodson Company*, 813 F.2d at 272 (in true participation, spread between interest paid by borrower and that provided to investor-participants would reflect seller's reasonable charge for servicing loan for investors).

requirement that the lead lender pay interest to the participant at a higher rate than it was charging the underlying borrower would seem more suggestive of a loan from the "participant" to the lead lender than a lower rate is. A participation that lasted longer than the underlying loan would clearly suggest a disguised loan to the lead lender, but one with a shorter term than the underlying loan seems more ambiguous on that point. Despite Citizens' argument to the contrary, it is clear the words "Term Loan" in ¶ 3.1 of the Agreement refer to the underlying loan, and not to the Purchaser's relationship to BCA. "Loan" is defined in ¶ 1.1 to mean the Debtor's obligation as described in the Agreement, and ¶ 3.1 specifies that BCA is selling the Purchaser an undivided interest in "the Principal and Interest hereafter accruing from the Loan."

In short, Citizens has pointed to nothing that would justify recharacterizing the Agreement as a loan, rather than a participation arrangement.

> ### 6. *The Defendants whose interests were created by the Certificates at least might have been subject to some risk of loss in the event the Debtor defaulted on the underlying loan.*

Cases considering whether financial transactions are true participations or disguised loans indicate the most important question is whether the alleged participant is subject to the risk of loss resulting from default by the underlying borrower.[28] If the participant is not subject to that risk, the transaction is a loan, not a participation. In the

---

[28]*See, e.g., Woodson Company*, 813 F.2d at 271-72 (fact participation seller relieved alleged buyers of "all risk of loss" was most significant fact leading to finding participations were actually loans to seller).

cases Citizens cited that determined the purported participation seller was guaranteeing repayment of the participants' investments, the seller was to pay the participants even if the borrower did not pay the seller,[29] the participants were to be paid before the seller from the loan payments or from collections after the borrower's default,[30] the seller was to pay the participants if the borrower defaulted,[31] the seller or its officers or other insiders guaranteed repayment of the participants' investments,[32] or the seller bought insurance that would pay the participants if the seller failed to.[33]

The seller's promise to repurchase the participants' shares in the future is somewhat similar to a guarantee the participants will be repaid. However, at least one authority says participation agreements often include a repurchase provision.[34] The Certificates do not state whether BCA's repurchase obligation included an obligation to pay any accrued, unpaid interest owed on the underlying loan at the time of repurchase, so the Defendants might have been running the risk of losing some interest despite the

---

[29]*Woodson Company*, 813 F.2d at 271; *Sackman Mortgage Corp.*, 158 B.R. at 934-35 (fact participant was to be paid before seller was one factor leading court to deny summary judgment on participant's claim participation could not be treated as loan to seller); *Coronet Capital*, 142 B.R. at 80-81.

[30]*Sackman Mortgage Corp.*, 158 B.R. at 934-35; *Coronet Capital*, 142 B.R. at 81.

[31]*Woodson Company*, 813 F.2d at 271;

[32]*Sackman Mortgage Corp.*, 158 B.R. at 934; *Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc. (In re S.O.A.W. Enterprises, Inc.)*, 32 B.R. 279, 282-83 (Bankr. W.D. Tex. 1983).

[33]*Woodson Company*, 813 F.2d at 268 and 271.

[34]Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 Tenn. L. Rev. 519, 520-21 (Spring 1984) (outlining five common provisions in participation agreements, and saying a category of agreed provisions often includes one for the seller to repurchase the participation).

23

repurchase provision. Furthermore, the Certificates do not suggest BCA had to repurchase the Defendants' interests even if the Debtor defaulted on its loan before the repurchase date arrived, so at least for the original three months before BCA's obligation to repurchase matured and then for the duration of the three-month extensions each of the three Defendants granted,[35] those Defendants at least might have been subject to the risk the Debtor would default. On default, the Certificates provided the Defendants would only receive their pro rata shares of whatever BCA might collect from the Debtor. The Court concludes BCA's obligation to repurchase in only three months, standing alone, as it does, in suggesting the transactions were loans rather than participations, is not sufficient to require a summary judgment ruling determining the Certificates in this case to be disguised loans.

### 7. *Citizens' lease recharacterization analogy does not suggest summary judgment is appropriate.*

Citizens also suggests recharacterizing the transactions it is attacking here would be analogous to recharacterizing a purported lease as a secured transaction, a relatively common occurrence under the Uniform Commercial Code. The Court notes that recharacterizing leases is a highly case-specific endeavor that is often not amenable to

---

[35]The Court notes two of the extensions added provisions that sound even more like guarantees of repayment. If BCA did not repurchase Northern Capital's interest at the end of the extension, Northern Capital could elect to get a specified amount of its own stock back from another Brooke company, and if the Debtor defaulted or BCA did not repurchase Security First Insurance Holdings' interest at the end of the extension, Security First was to get a credit equal to its participation amount against its debt to another Brooke company.

24

summary judgment treatment. The analogy will not lead the Court to recharacterize the Certificates and Agreement on the present showing.

> **D.  Citizens has not established for purposes of summary judgment that BCA had at least apparent authority to subordinate its lien on the FLAC stock to Citizens' lien.**

Citizens argues it was told BCA would agree to subordinate its lien to Citizens' lien, and it did not know BCA's obligations under the Certificates and the Agreement prevented it from doing so. The Defendants respond that BCA's willingness to agree to subordinate its lien was expressed early in the workout negotiations, and that an attorney-officer told Citizens in connection with the subsequent creation and execution of the Payment Agreement and the Escrow Agreement that there were participants in BCA's loan to the Debtor who would not agree to the subordination. The Court concludes this raises a factual dispute that cannot be resolved by summary judgment about whether Citizens could reasonably have believed BCA had the authority to subordinate the lien.

> **E.  Citizens' Claim Based on the Payment Agreement**
>
> **1.  The Payment Agreement does not unambiguously require the Debtor and BCA to pay Citizens the proceeds of the FLAC stock under all circumstances.**

Citizens argues the Payment Agreement unambiguously required the Debtor and BCA to give it any proceeds they might receive from a sale of the FLAC stock. Citizens correctly notes the Agreement says the Debtor and BCA must pay it any proceeds they

25

are "entitled to receive, directly or indirectly." The Debtor owned the FLAC stock and BCA had a lien on it, so, according to Citizens, one or the other of them would clearly be "entitled to receive" the proceeds from any sale of the stock. Under the Agreement, therefore, Citizens concludes, the proceeds must be delivered to it. The Court cannot agree.

In the Payment Agreement, the phrase "entitled to receive" could mean either "entitled to get temporarily before fulfilling an existing obligation to pass on to a third party," or "entitled to get and keep." In effect, Citizens is arguing the phrase is limited to the first meaning. But consideration of the context in which the phrase is used raises doubts about that assertion. The Payment Agreement says the Debtor and BCA must give Citizens such proceeds only "[i]f, in connection with any sale . . . of any equity interests or assets of FLAC, [either the Debtor or BCA] is entitled to receive, directly or indirectly, any proceeds from such sale or disposition." Since the Debtor owned the FLAC stock and BCA had a lien on it, how could they *not* be "entitled to receive" the proceeds from its sale at least temporarily? Yet the conditional phrasing, which Citizens admits its own attorney drafted,[36] suggests the parties recognized there could be a situation when the Debtor and BCA would not be "entitled to receive" the proceeds. If no such situation could exist, why didn't the Payment Agreement simply say the Debtor and BCA agree to apply the proceeds from any disposition of the FLAC stock to the Debtor's debt to

---

[36]*See Botkin v. Security State Bank*, 281 Kan. 243, 254-55 (2006) (Kansas courts construe ambiguous language against drafter of document).

Case 08-06132   Doc# 201   Filed 01/20/11   Page 26 of 29

Citizens?  The Defendants contend such a situation could and did exist, namely, that the pre-existing Certificates and Agreement required BCA to give proportionate shares of the FLAC stock proceeds to them.  In other words, the Defendants argue the Payment Agreement required the Debtor and BCA to pay to Citizens only proceeds they were otherwise "entitled to get and keep."  This ambiguity in the Payment Agreement prevents granting a summary judgment based on Citizens' preferred construction of the Agreement.

> **2.** *Even if the Payment Agreement clearly gave Citizens' lien priority over the lien of BCA (and the Defendants), the simultaneously-executed Escrow Agreement raises the factual question whether the Debtor, BCA, and Citizens intended to give Citizens' lien that priority.*

But even if the Payment Agreement did clearly say that the Debtor and BCA would pay Citizens from the proceeds of the FLAC stock under all circumstances, the parties executed another document that raises the question whether that was their intent in the transaction.  The Escrow Agreement, signed "as of" the same date as that stated on the Payment Agreement, says BCA's lien on the stock has first priority and Citizens' lien has second priority.  If the parties intended for the Payment Agreement to give Citizens a prior claim to any proceeds BCA might receive from the FLAC stock, why did they say in the Escrow Agreement that the priority arrangement was the opposite?  Kansas law requires documents executed by the same parties at or near the same time, or even at

27

different times, in connection with the same transaction and subject matter, to be construed together to determine the intent of the parties to the transaction.[37]  Even if the Payment Agreement unambiguously said Citizens' claim to the proceeds of the FLAC stock was superior to any claims the Debtor and BCA could make, the Escrow Agreement's contrary description of the priority of BCA's and Citizens' liens would raise a question whether that was what the parties truly intended.  The e-mail exchange between the Brooke attorney and Citizens' attorney bolsters the Defendants' claim that the parties intended for BCA's lien, and through it, the Defendants' liens, to have priority over Citizens' lien.  The Brooke attorney's deposition testimony that he believed the Defendants' interests in the FLAC stock were superior to Citizens' lien provides additional factual support for that claim.

> **3.      Ruling about Citizens' argument based on the Payment Agreement.**

Based on these considerations, the Court concludes the Payment Agreement does not unambiguously establish that Citizens' claim to the proceeds of the FLAC stock is superior to BCA's claim or to the Defendants' claims, so Citizens is not entitled to summary judgment on that question.

---

[37]*Hollenbeck v. Household Bank*, 250 Kan. 747, 752 (1992); *Topeka Savings Assoc. v. Beck*, 199 Kan. 272, 275 (1967); *Fleetwood Enterprises, Inc., v. Coleman Co., Inc.*, 37 Kan. App. 2d 850, 858 (2007).

### III.  Conclusion

For these reasons, the Court concludes Citizens' motion for summary judgment must be and it is hereby denied.

# # #