**SO ORDERED.**

**SIGNED this 5th day of October, 2012.**



Dale L. Somers
United States Bankruptcy Judge

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CAPITAL CORP.,** | **CASE NO. 08-22789-7**<br>**CHAPTER 7** |
| DEBTOR. | |
| **CITIZENS BANK & TRUST CO.,** | |
| PLAINTIFF, | |
| v. | **ADV. NO. 08-6132** |
| **ALBERT A. RIEDERER,**<br>**SOUTHERN FIDELITY MANAGING**<br>  **AGENCY, LLC,**<br>**SECURITY FIRST INSURANCE**<br>  **HOLDINGS, LLC,**<br>**NORTHERN CAPITAL, INC.,**<br>**BANK OF KANSAS, et al.,** | |
| DEFENDANTS. | |

**OPINION DETERMINING PARTIES' ENTITLEMENT TO**
**PROCEEDS OF FLAC STOCK**

This proceeding is before the Court for decision following a trial on the merits held

on May 4, 5, and 6, 2011.  Plaintiff Citizens Bank & Trust Company appeared by counsel Mark A. Shaiken and Brian K. O'Bleness of Stinson Morrison Hecker LLP.  Defendants Security First Insurance Holdings, LLC, and Bank of Kansas appeared by counsel David L. Marcus of Graves Bartle Marcus & Garrett.  Defendants Southern Fidelity Managing Agency, LLC, and Northern Capital, Inc., appeared by counsel John R. Weist of Long & Luder, P.A.  Having heard evidence and the arguments of counsel, and having received post-trial briefs, the Court is now ready to rule.[1]

This is a declaratory judgment action to determine rights in the proceeds from the sale of certain stock owned by the Debtor, Brooke Capital Corporation.  Both Plaintiff Citizens and the Defendants claim to have first priority rights to the proceeds of the stock, in which the Debtor's subsidiary, Brooke Capital Advisors (BCA), had a security interest.  After the Debtor filed for bankruptcy, the stock was sold, and the proceeds are being held pending the outcome of this proceeding.  Citizens obtained its security interest in the stock from the Debtor as part of a loan workout.  The Defendants claim to have prior rights through a security interest granted by the Debtor to BCA to secure a loan from BCA to the Debtor, in which the Defendants contend they purchased participation interests.  The Debtor and BCA, although initially defendants, were dismissed by an agreed order.[2]  After giving the matter due consideration, the Court concludes that

---

[1]This opinion addresses the competing claims of Citizens and the rest of the original defendants to the proceeds from the sale of the FLAC stock.  However, StoneRidge Capital Advisors has intervened in the proceeding as a defendant, and this opinion will not address its claim.

[2]Dkt. 151.

Citizens is entitled to the sale proceeds, but subject to the superior claim of Defendant

Bank of Kansas to 14.54% of the sale proceeds.

## I.  Findings of Fact

The Brooke group of companies was involved in many aspects of insurance and

insurance-related businesses.  A number of the Brooke companies were involved in one

way or another in the transactions at issue in this adversary proceeding.  The parent

company was Brooke Corporation, whose stock was publicly traded.  Brooke Capital

Corporation ("the Debtor") was a majority-owned subsidiary of Brooke Corporation.  The

Debtor, in turn, owned 100% of two subsidiaries, Brooke Capital Advisors, Inc. ("BCA"),

and First Life America Corporation ("FLAC").  Another relevant majority-owned

subsidiary of Brooke Corporation was Brooke Credit Corporation, d/b/a Aleritas Capital

Corporation ("Aleritas").  A related company called Brooke Holdings, Inc., was also

involved in some of the events at issue in this case.  Robert D. Orr founded Brooke

Corporation and, through Brooke Holdings, he and members of his family owned

interests in Brooke Corporation and various related companies.

### A.        Brooke Capital Advisors' transaction with the Debtor.

The Debtor and its subsidiary, BCA, signed a "Commercial Loan Agreement" and

a  "Stock Pledge and Security Agreement," effective December 31, 2007.  The amount of

the loan was stated to be "as much as" $12,382,000, and an interest rate was specified

based on one published in the Wall Street Journal.  The loan principal, plus interest, was

to be amortized over 84 months and monthly payments were to be made, but a balloon

payment would be due after 48 months for the full amount then owed. The Debtor was to

give BCA a promissory note ("Note"). Although many of the documents admitted into

evidence mention the Note and a witness who was working for a bank that bought an

interest in the loan claimed he would have reviewed the Note in helping his bank decide

to make that purchase, the Note itself was not produced at trial. The Commercial Loan

Agreement said the loan would be secured by, among other things, all the Debtor's

interest in FLAC, and the Debtor executed a "Stock Pledge and Security Agreement"

("Pledge") that pledged the FLAC stock as collateral.[3]  The Commercial Loan

Agreement said "the purpose of the loan is to restructure debt to increase [the Debtor's]

long term debt and decrease its short term obligations as acquired in conjunction with [the

Debtor's] merger with [another Brooke company] and for such other business purposes as

[the Debtor] may engage in subject to [BCA's] approval."

**B.      *Facts regarding whether funds were advanced under the Commercial
          Loan Agreement.***

Citizens relies upon the failure of the Defendants to produce the Note to question

whether BCA advanced the funds in accord with the Commercial Loan Agreement.

Despite the absence of a copy of the Note, the following evidence convinces the Court

that the $12.382 million loan was made.

The Debtor was a publicly-traded company, so it had to file certain quarterly

---

[3]Although the evidence that BCA or someone on its behalf contemporaneously took possession of
the stock is not convincing, evidence of later events establish that at the time the Debtor filed for relief
under the Bankruptcy Code, BCA's security interest was perfected by possession of the FLAC stock by
an escrow agent on BCA's and Citizens' behalf.

4

reports, known as "Form 10-Q Reports" or simply "10-Qs," with the United States Securities and Exchange Commission. The Debtor's 10-Qs for March 31, 2008, and June 30, 2008, were admitted into evidence. Both 10-Qs state that they contain combined financial statements for the Debtor and its subsidiaries, including BCA and FLAC.

A somewhat lengthy note to the 10-Q for March 2008 says Brooke Holdings loaned $12,382,000 to the Debtor in December 2007, with interest based on a prime rate published in the Wall Street Journal. The copy of this 10-Q provided to the Court has been cut off on the right-hand side, so some information the note contained has been omitted. However, it is possible to tell that the note says annual principal payments on the loan are scheduled, with a payment of $8,154,000 due in December 2011. The loan is said to be secured by a pledge of the Debtor's stock in "Firs," but the rest of the information about the stock is cut off. The 10-Q says the Debtor's subsidiaries include three companies whose names begin with "First" — FLAC, First Capital Venture, Inc., and First Brooke Insurance and Financial Services, Inc. However, FLAC is described as "a licensed insurance company distributing a broad range of individual life and annuity insurance products to individuals in eight states," First Capital Venture is described as "a shell company with no operations and no plans for operations at this time," and First Brooke Insurance is described as "a Texas corporation used for licensing purposes." Given these descriptions, it is clear that FLAC is the company whose stock was identified as the security for the $12 million loan. A confusing sentence, part of which has been cut off, seems to say that as of March 31, 2008, all but $1,082,000 of the loan had been sold

5

to other participating lenders, yet somehow $7,072,000 remained payable to Brooke Holdings. However, no one made an issue of this anomaly at trial.

The copy of the June 2008 10-Q appears to be complete. A note to that 10-Q says BCA, not Brooke Holdings, had loaned $12,382,000 to the Debtor in December 2007, with interest based on a prime rate published in the Wall Street Journal. This note says monthly payments of $222,000 are scheduled, with a final payment of $5,910,000 due in December 2011. The loan is secured by the guaranty of the Debtor's parent company, Brooke Corporation, and by the Debtor's pledge of its FLAC stock. The note says BCA originally sold "the entire participating interest" in the loan to Brooke Holdings, but that on June 30, 2008, all but $1,061,000 of the $12,137,000 amount outstanding had been sold to other participating lenders, although $6,554,000 remained payable to Brooke Holdings. Again, no one made an issue of this anomaly at trial.

In any event, despite the discrepancies between them, it is clear these 10-Q notes are discussing the same loan. No evidence was offered to explain why the 10-Q for March 2008 said the loan was made by Brooke Holdings while the 10-Q for June 2008 said it had been made by BCA. Carl Baranowski, an attorney who worked as general counsel for Brooke Corporation and in-house counsel for other Brooke entities and also held offices with some of the entities, testified that BCA did not have enough cash in December 2007 to have loaned more than $12 million to the Debtor, but that a debt in that amount might have been built up over a period of time that was then documented with the Commercial Loan Agreement, the Note, the Pledge, and other documents.

6

The record contains additional evidence that a loan was made. An escrow agreement signed by Citizens, described below, recited that funds were advanced under the Commercial Loan Agreement. A July 9, 2008, letter from Baranowski as general counsel for Brooke Corporation to the Office of Thrift Supervision recited that the loan was made. The Commercial Loan Agreement provides that the "Loan shall be evidenced by the Agreement, the Note, the Loan Documents, and notations made from time to time by lender in its books and records." BCA's books and records contain notations of the loan.

Citizens tried to suggest some kind of fraud was involved. The foregoing summarizes the evidence presented at trial regarding the loan. It fails to show such impropriety occurred, beyond the limited discrepancies noted above. It also fails to establish that the amount loaned was other than that recited in the documents. Based on all the evidence presented, the Court finds it is more likely than not that the Commercial Loan Agreement documented a valid debt the Debtor owed to BCA in the approximate amount of $12 million. The Court will refer to the debt as the "BCA-Debtor Loan."

### C.    *Agreements claimed to be participation agreements.*

In March 2008, BCA executed three documents labeled "Participation Certificate and Agreement" and one labeled "Participation Agreement." These documents purported to sell to Defendants Northern Capital, Inc., Southern Fidelity Managing Agency, LLC, Security First Insurance Holdings, LLC, and Bank of Kansas (through a predecessor) fractional interests called "participations" in the BCA-Debtor Loan; the fractional

7

interests covered by the documents add up to 86.87%, which would leave BCA with a 13.13% share. The documents note that the collateral for the BCA-Debtor Loan included the FLAC stock. None of the purported buyers under these agreements filed a Uniform Commercial Code financing statement concerning the interest it received under its agreement.

        1.        *"Participation Certificate and Agreements" held by Northern Capital, Southern Fidelity Managing Agency, and Security First Insurance Holdings.*

At the time they bought these participation interests, Northern Capital, Security First, and Southern Fidelity each owed a large loan to Aleritas. On March 28, 2008, Aleritas sent similar letters, signed by its chief executive officer, to both Northern Capital and Southern Fidelity, promising to make certain concessions on their Aleritas loans in return for their purchases of participations in the BCA-Debtor Loan. The letters also said "[I]n the event of default by Brooke on this participation, the participation amount purchased by you will be applied to principal and interest on your current loan outstanding with Aleritas." Although no letter from Aleritas to Security First was offered into evidence, the managing member of Security First, Wallace Lockwood Burt, testified that in March 2008, in order to induce Security First to buy the participation in the BCA-Debtor Loan, Aleritas agreed "to reduce the amount of the loan to Security First Holdings by the amount of purchase participation in the event that Brooke is unable or unwilling to

8

repurchase the participation at the end of the 90-day period."[4]

The three documents called "Participation Certificate and Agreement"
("Participation Certificates") were executed on identical two-page forms and are dated
March 28, 2008.  Each states that BCA was selling to one of the three "Purchasers,"
without recourse to BCA, shares of the BCA-Debtor Loan.  BCA transferred (1) 8.07% to
Northern Capital, Inc., for $1 million; (2) 40.4% to Security First Insurance Holdings,
LLC,[5] for $5 million; and (3) 24.22% to Southern Fidelity Managing Agency for $3
million.[6]  Each of these Participation Certificates included a section labeled "Loan
Background Information" that described the BCA-Debtor Loan.  The last part of this
section provided space for "Additional information.  (Describe)" into which the following
had been added, "Seller agrees to repurchase Purchaser's interest on or before June 30,
2008."

The Certificates called for BCA to share any payments the Debtor made on the
BCA-Debtor Loan pro rata with the Purchasers.  They also provided that the BCA-Debtor
Loan was secured by, among other things, the FLAC stock, and that BCA was assigning a
proportionate share of its security interests to each Purchaser and would hold those shares
for their benefit.  The Purchasers' interest rates were set based on a "Wall Street prime

---

[4]Trial transcript, vol. II, May 5, 2011, at 169-70.

[5]The original document identified the "Purchaser" as "Security First Holdings, LLC," but the
parties later amended the name to "Security First Insurance Holdings, LLC."

[6]The Court notes the Participation Certificates all state the amount of the BCA-Debtor Loan was
$12,385,000.  The percentage shares stated in the documents would be essentially the same whether the
loan amount was $12.382 million or $12.385 million.

9

lending rate" plus 4.5%, the same as the rate provided in the Loan Agreement between BCA and the Debtor. There was to be no sharing of (1) borrower fees, (2) expenses to protect the loan and collateral (such as advances to pay taxes, insurance, attorney fees, and court costs), or (3) administrative fees (charges for servicing the loan). BCA was entitled to keep all borrower fees and obliged to pay all expenses and servicing costs.

Paragraph 12 of the Certificates, labeled "Administration," included these provisions about the administration of the BCA-Debtor Loan:

A. Loan Servicing. Seller may administer the Loan and any related security and guaranties as though it were the sole owner and holder thereof. Except as provided below, Seller will make all decisions concerning the servicing of the Loan and any related security and guaranties, acceleration, foreclosure, acquisition of other security or guaranties, deficiency judgments, purchase at foreclosure sales, and administration and disposition of acquired security. Seller will not, without Purchaser's written consent, reduce principal or interest with respect to the Loan or release or allow for the substitution of any Property, outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan. Seller will not, without Purchaser's written consent, renew, extend or consent to the revision of the provisions of any note or security documents covered or waive any claim against Obligor.

B. Seller's Duty to Purchaser. Seller will use the same degree of care in servicing and collecting the Loan as it would for its own accounts. Seller will not be liable to Purchaser for any action taken or omitted or for any error in judgment, except for bad faith or willful misconduct.

The Participation Certificates stated that BCA's address was in Kansas, and paragraph 23(C) provided that, with one exception not involved here, the law of the jurisdiction where the participation seller, BCA, was located would govern the Certificates.

In late June or early July, 2008, BCA and the three Purchasers signed addenda to

10

the Participation Certificates, which are similar but differ from one another to some degree. They all extended the repurchase date to September 30, 2008. Aleritas joined in the addendum between BCA and Security First, but not the other two. It agreed to provisions which support Wallace Lockwood Burt's testimony that Aleritas had made promises to Security First in March 2008 that were similar to those it had made to Northern Capital and Southern Fidelity in the March 28, 2008, letters. Aleritas promised that "[I]n the event of any default on the participation, or failure by [BCA] to repurchase the loan participation as contemplated by the Repurchase Provision, as amended, then the participation amount will be applied to principal and interest on [Security First's] current loan outstanding with Aleritas Capital."

The Participants received payments required by the Participation Agreements through August 2008.

## 2. *"Participation Agreement" held by Bank of Kansas.*

The Participation Agreement stated that BCA was selling to First National Bank of Johnson County, the predecessor to Defendant Bank of Kansas, a 14.54% share of the BCA-Debtor Loan for $1.8 million. There is no evidence that First National Bank of Kansas was indebted to Aleritas or that the sale of the participation interest was influenced by any relationship between the bank and other Brooke entities.

The thirteen-page Participation Agreement was very different from the Certificates in form, although it contained many similar provisions. It did not state whether the transfer was with or without recourse to BCA. Unlike the Participation Certificates, the

11

Participation Agreement contained no provision obligating BCA to repurchase the Purchaser's interest at any time. The first paragraph of the Participation Agreement identified BCA as the originating lender and First National Bank as a participating lender or "Purchaser." Section 1.1 contained definitions, including one defining "Borrower" to mean the Debtor, and another defining "Loan" to mean "Borrower's obligation as described in this Participation Agreement and includes, but is not limited to, all collateral and guaranties of repayment taken in connection with the Loan." Section 3 of the Agreement is labeled "Sale of Participation" and the first paragraph of the section reads: "**3.1 Term Loan.** In consideration of the sum of $1,800,000.00, Seller hereby sells and certifies to Purchaser an undivided 14.54 percent interest (Share) in the Principal and Interest hereafter accruing from the Loan." Under the Participation Agreement, it is clear the word "Loan" refers to the BCA-Debtor Loan.

The Participation Agreement recited the interest rate provided in the BCA-Debtor Loan, and said the Purchaser's interest rate, also based on a prime rate published in the Wall Street Journal, would be approximately two and a half percent less. BCA was to receive the Debtor's payments and to pay the Purchaser its pro rata share. The Purchaser was to pay its pro rata share of loan expenses incurred to protect the loan and collateral (such as taxes, insurance, attorney fees, and court costs), and to receive a pro rata share of any borrower fees, but BCA was to bear all the costs of administering and servicing the loan. The Participation Agreement said that the collateral for the BCA-Debtor Loan included a pledge of 100% of the Debtor's interest in the FLAC stock, and that a

12

"security interest in the collateral is assigned and sold to Purchasers . . .  in proportion to each Purchaser's investment and is held by Seller for the benefit of Purchaser."

Section 12 of the Participation Agreement, labeled "Administration," included the following provisions about the administration of the BCA-Debtor Loan:

> Section 12.1  Loan Servicing.  Subject to the provisions of Section 19, Seller may administer the Loan and any related security and guaranties as though it were the sole owner and holder thereof.  Except as otherwise provided herein and as provided in Section 19, Seller will make all decisions concerning the servicing of the loan and any related security and guaranties, acceleration, foreclosure, acquisition of other security or guaranties, deficiency judgments, and administration and disposition of acquired security.  Seller will not, without Purchasers' written consent, reduce principal or interest with respect to the Loan or release or allow for the substitution of any security outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan.  Seller will not, without Purchasers' written consent, renew, extend or consent to the revision of the provisions of the Note or security documents covered or waive any claim against Obligor.

> Section 12.2  Seller's Duty to Purchasers.  Seller will use the same degree of care in servicing and collecting the Loan as it would for its own accounts.  Seller will not be liable to Purchasers for any action taken or omitted or for any error in judgment, except for bad faith or willful misconduct.

Section 23.4 stated that the Agreement would be governed by the laws of the State of Kansas.

### D.    *Citizens' Workout Agreement with the Debtor and BCA*

On December 31, 2007, Citizens loaned $9 million to the Debtor ("the Citizens-Debtor Loan").  It was secured by stock in affiliates of the Debtor, but not by the FLAC stock.  The Debtor soon defaulted on the loan, and the parties began workout discussions.

13

A number of documents relating to the workout discussions were presented at trial, along with the testimony of three people who were involved in them. A senior vice president of Citizens, Stephen Nepote, was in charge of the discussions for the bank. After an agreement was reached, attorney Mark Ovington was in charge of drafting the necessary documents for Citizens. Carl Baranowski, general counsel for the Debtor and other Brooke companies, was involved in the discussions for both the Debtor and BCA, and also worked with Ovington in drafting the documents.

In a letter to Citizens dated May 5, 2008, the Debtor's chairman requested flexibility regarding the May 31, 2008, maturity of the Citizens-Debtor Loan. He stated that the former plan to repay the loan from proceeds of the sale of Aleritas was no longer feasible. He advised that the Debtor had a long-term loan secured, in part, by the FLAC stock, and the lender had agreed to release its lien when the stock was sold so Citizens' loan could be repaid, and have the Debtor's stock that was securing Citizens' loan substituted as the lender's collateral. Nepote responded with a letter dated May 22 saying, among other things, that Citizens would need correspondence from the lender with the lien on the FLAC stock acknowledging that the sale proceeds could be used to pay Citizens. The Debtor's chairman responded to Nepote by a letter dated May 29, with which he included a letter from BCA to Citizens, in which the president of BCA confirmed that BCA would release its lien on the FLAC stock when three things occurred: (1) FLAC was sold, (2) Citizens released its lien on shares of the Debtor's stock, and (3) Brooke Corporation pledged those shares as security for BCA's loan to the

14

Debtor.  The president added, "We believe that the [Debtor's] shares have a greater long term fair market value than our current collateral, and we plan to hold that collateral over the life of our long-term loan to [the Debtor]."   Nepote testified that he understood the three things would happen simultaneously at the closing of a sale of the FLAC stock.

On May 30, 2008, Nepote sent an email to the Debtor's chairman asking, among other things, whether BCA had creditors with a lien on its assets that would include the FLAC stock and, if so, whether those creditors agreed to BCA's proposed actions.  The Debtor's chairman responded by a letter dated June 3 in which he said that BCA did not have a creditor with a lien on its assets that could encompass the FLAC shares held as security, and that the Debtor had no such creditor either, other than BCA.  Nepote testified that this letter satisfied him that BCA could give the proceeds of the FLAC stock to Citizens.

On June 19, 2008, a different senior vice president of Citizens sent a letter to a Brooke Corporation official specifying various conditions that must be met for the bank to grant an extension on the Debtor's loan.  The conditions included:  (1) "Full agreement from [the Debtor and BCA] that 100% of the proceeds of the sale of FLAC will be directed to Citizens Bank and Trust as a permanent reduction in our credit facility to [the Debtor]"; and (2) "We will require a 1st or 2nd pledge of stock of FLAC (2nd only to [BCA])."   In addition, the bank required a $250,000 reduction in the principal owed on the loan, a $45,000 "extension fee," and an increase in the interest rate on the loan.  The letter does not address Citizens' release of its lien and the substitution of collateral, two

15

provisions included in the May 5, 2008, and May 29, 2008, letters to Citizens. Nevertheless, Baranowski replied with a letter dated June 20, 2008, saying the Debtor and Brooke Corporation, among others, accepted Citizens' offer for the loan extension.

The parties then took steps to document their agreement as reflected in the June 19, 2008, letter. The documents the parties produced to formalize the workout will be referred to collectively as the "Workout Documents." They were an amended note, a security agreement and related UCC-1, a payment agreement, and an escrow agreement, the relevant portions of which are examined below. It is important to note that none of these documents addressed the substitution of collateral for the BCA-Debtor Loan, an aspect of the proposed workout which was included in the correspondence from the Debtor's chairman on May 5, 2008, and included in the May 29, 2008, letter from BCA to Citizens, but omitted from the June 19, 2008, letter from Citizens to Brooke Corporation.

Both the Debtor and Citizens signed a "Second Amendment to Promissory Note" that was dated "as of June 25, 2008." This document included a paragraph that said the Debtor and BCA "shall agree with [Citizens], in a writing acceptable to the Bank (the 'Payment Agreement'), that all proceeds of any sale of any equity interests of assets of [FLAC] will be paid to the Bank to the extent necessary to pay all principal, interest and any other amounts that [the Debtor] then owes the Bank." The Debtor signed a "Security Agreement" dated "as of June 25, 2008," giving Citizens a security interest in all its personal property — this would include its FLAC stock — to secure all obligations of the Debtor to Citizens. On June 25, 2008, Citizens filed a UCC-1 financing statement in an

16

effort to perfect that security interest.

As noted earlier, attorney Ovington was representing Citizens in connection with the Workout Agreement, and he drafted the "Payment Agreement" mentioned in the Second Amendment to Promissory Note. That document, dated June 25, 2008, was in the form of a letter from the Debtor and BCA to Citizens, and was signed by representatives of both the Debtor and BCA. The document stated that it was the Payment Agreement referred to in the Second Amendment to Promissory Note, and Nepote testified that was correct. The most important sentence in it for present purposes reads: "If, in connection with any sale or other disposition of any equity interests or assets of FLAC, [either the Debtor or BCA] is entitled to receive, directly or indirectly, any proceeds from such sale or disposition, [that company] shall immediately pay such proceeds to [Citizens] to the extent necessary to satisfy [the Debtor's debt to Citizens]." Ovington testified he used this broad language because he did not know what form the FLAC sale might take — for example, FLAC might sell all its assets and receive the proceeds itself. Nepote testified the language was intended to mean the same thing as the paragraph in the Second Amendment to Promissory Note about the Debtor and BCA's obligation to give Citizens the proceeds of any sale of the FLAC stock. The Payment Agreement provided that it would be governed by the laws of the State of Missouri.

Ovington and Baranowski communicated by email about the documents for the

17

workout agreement.[7]  On June 25, 2008, Baranowski said he had attached to his email "signed documents for the second amendment to the promissory note and related transactions," and would overnight the originals to Ovington.  In response, Ovington asked, among other things, who was holding the FLAC stock the Debtor was pledging to Citizens.  Baranowski replied that he was holding the FLAC certificates on behalf of BCA, "the first lienholder."  In the morning of June 26, Ovington asked if Citizens could hold the FLAC stock in order to perfect its lien on it.  Baranowski responded that the participants on the BCA-Debtor Loan would object to that.  He testified he had not seen the participation documents at that point and had not talked to any of the participants, but just assumed a reasonably prudent participant would object to Citizens holding the stock.  Ovington testified this June 26 email was the first notice he had that there were participants on that loan.  He also testified that he had already received from Baranowski signed copies of the Second Amendment to Promissory Note, the Payment Agreement, and the Security Agreement in the afternoon of June 25, before he learned of the existence of the participants.

Baranowski offered to draft an agreement to place the FLAC stock in escrow so that both BCA's and Citizens' liens on the stock would be perfected, and Ovington agreed to have him do that.  Baranowski sent a draft escrow agreement in the afternoon of June 26.  On June 27, the men exchanged more emails.  Ovington noted that Baranowski

---

[7]Copies of the emails were sent to a number of other people, but Baranowski and Ovington were the ones writing the emails described here.

had mentioned participants in BCA's loan to the Debtor, and asked, "Who are these participants, and wouldn't the existence of participants impair [BCA's] ability to apply the proceeds from a sale of FLAC stock to pay the Citizens debt?  On a related point, I'm still confused as to why, given that [BCA] has agreed to remit to Citizens the proceeds from any sale of the FLAC stock, Citizens can't hold that stock and release it to the buyer pursuant to a payoff letter among the [Debtor, BCA], the buyer and Citizens?"  Baranowski replied, "Paying off Citizens with FLAC sale proceeds is OK because paying off Citizens frees up much collateral, and the participants have agreed to take only part of that freed collateral in substitution for FLAC, freeing up the rest of the collateral for other corporate purposes.  Even though they are willing to substitute collateral, FLAC hasn't sold and Citizens hasn't been paid off yet, and until all that happens, they aren't willing to give up their lien position."  Ovington testified this reply made sense to him because "Brooke" had been claiming all along that Citizens was oversecured.  Baranowski testified that by the time he wrote this message, he had read a copy of the participation documents used to sell interests in the BCA-Debtor Loan and interpreted it to mean the participants had agreed BCA could undertake the proposed collateral substitution without seeking further permission from them.  He had not actually contacted the participants at the time to ask whether they would agree to the transaction, but believed the documents authorized BCA to do it.  That is what he meant when he wrote that the participants had agreed to allow the FLAC sale proceeds to be paid to Citizens.

Between them, Baranowski and Ovington produced a document titled "Escrow

19

Agreement" that addressed the FLAC stock.  It said in its first sentence that it was "dated as of June 25, 2008," but all the signatures on its fifth page were dated June 30, 2008.  The document identified the Debtor as the "Pledgor," BCA as "First Lien Lender," and Citizens as "Second Lien Lender."  It said the Debtor had previously given BCA "a first priority security interest in 100% of all of the common stock" of FLAC to secure its debt to BCA, and that the Debtor had delivered to BCA certificate number 18, representing almost 1.5 million shares of FLAC common stock.  The document then said, "Pledgor has, with First Lien Lender's consent, granted to Second Lien Lender a second priority security interest in the [FLAC common stock]."  This document will be referred to as the "Escrow Agreement."  Ovington testified the Escrow Agreement was simply a lien perfection device and was not creating rights between Citizens and BCA.

Baranowski testified that the workout agreement among the Debtor, BCA, and Citizens turned out to be "stillborn."  He said the transaction had two economic underpinnings:  (1) the stock in the Debtor that was going to wind up securing the BCA-Debtor Loan had to be worth more than the FLAC stock that was going to be sold, and (2) the proceeds from the sale of the FLAC shares plus available cash from "Brooke" had to be sufficient to pay off Citizens in full, so that Citizens would release its collateral.  He based his view of the first underpinning on the form participation agreement he had seen that said BCA could not "compromise payment" by substituting collateral that was worth less than the existing collateral.

On July 9, 2008, the Debtor accepted an offer from a non-Brooke company to buy

20

the FLAC shares for approximately $7.9 million, and at that time, the Debtor's shares were worth significantly more than that price. That sale was never completed, however, because of significant problems that began afflicting the financial markets in the summer of 2008. On July 18, 2008, Michael Hess, President and CEO of BCA, sent a letter to the Participants informing them that BCA had agreed to a request from the Debtor to substitute shares of the Debtor as collateral for the BCA-Debtor Loan in place of the FLAC shares, which were then the subject of an offer to purchase for approximately $7.9 million. The participants did not agree that BCA could unilaterally substitute collateral. Representatives of Southern Fidelity immediately called Mr. Hess and informed him that Southern Fidelity would not release its collateral. The predecessor to Bank of Kansas as the holder of the Participation Agreement informed Mr. Hess that it would not allow the substitution without the approval of its board, which was not given. But since the contemplated sale never occurred, the issue did not come to a head.

As the summer of 2008 progressed, both companies' shares decreased in value as a national financial crisis hit. The value of the Debtor's shares dropped faster than the value of the FLAC shares. In addition, the FLAC shares dropped so much that the Brooke companies did not have enough cash to add to the FLAC proceeds to pay off Citizens' loan. However, Baranowski could locate nothing in the Workout Documents that made the two items he called the economic underpinnings of the deal conditions for Citizens to receive the proceeds of the FLAC stock, nor did he suggest Citizens had agreed the workout agreement would not remain in effect if the economic underpinnings

21

he identified did not occur.

Despite Baranowski's description of the transaction as stillborn, nothing in the Workout Documents established any conditions that had to be met for Citizens to be paid the proceeds of a sale of the FLAC stock except for the sale itself. Baranowski did not testify that Citizens agreed to be paid the FLAC sale proceeds only if the entire transaction worked out as he envisioned it. Nepote testified that if the Brooke companies had told him they could not and would not use the proceeds of the FLAC stock to pay Citizens, Citizens would in all likelihood have moved to foreclose on the Debtor's stock. In short, while the Debtor and BCA might have expected the transaction to satisfy the conditions Baranowski identified, they failed to include in their workout agreement with Citizens or otherwise get Citizens to agree to any provision that would excuse them, for any reason, from giving Citizens the proceeds of a sale of the FLAC stock. Rather, all parties seemed to assume that because the proceeds from the sale of the FLAC stock were expected to be more than sufficient to pay Citizens in full, and such payment would result in the release of collateral having value in excess of the value of the FLAC stock, a procedure to substitute the released collateral in place of the FLAC stock as security for the BCA-Debtor Loan could easily be reached by the Debtor and its affiliate, BCA, and that the participants would acquiesce in the substitution.

### E. The Debtor's bankruptcy filing and the sale of the FLAC stock.

In September 2008, a lawsuit was filed in federal district court against the Debtor and some related companies, and Albert A. Riederer was appointed as a special master to

take control of the Debtor. On October 28, 2008, the special master filed a Chapter 11 bankruptcy petition on behalf of the Debtor, and the special master was appointed to serve as the Chapter 11 trustee for the Debtor's estate. The trustee filed a motion to sell the Debtor's FLAC stock, and an order authorizing the sale was entered on December 28, 2008. The sale price was $2.5 million. The Debtor's bankruptcy case was converted to Chapter 7 in June 2009, and the Chapter 11 trustee was appointed to serve as the Chapter 7 trustee for the Debtor's estate. As indicated, the FLAC stock proceeds are being held pending the outcome of this proceeding. In November 2011, Riederer resigned as the bankruptcy trustee and was replaced by Christopher J. Redmond.

## II. Discussion

### A. The dispute and the parties' positions.

The Court finds the exhibits evidence a loan from BCA to the Debtor of approximately $12 million, secured by a first priority lien in the FLAC stock and its proceeds. If, as the exhibits purport to establish, the Defendants are holders of participation interests in the BCA-Debtor Loan, the Defendants are entitled to the FLAC proceeds in proportion to their interests. The Court also finds that the exhibits evidence that the Debtor is indebted to Citizens under the terms of a $9 million note, and that this debt is secured by a second priority lien in the FLAC Stock. But since the FLAC proceeds are less that the amount of the BCA-Debtor Loan, the second priority lien holder would get none of the proceeds. Therefore, if this case were decided based solely upon the face of the loan documents, the Defendants, not Citizens, would be entitled to the sale

23

proceeds.

The intent of the Workout Documents, and the Payment Agreement in particular, was to change this result and to require the Debtor and BCA to pay the proceeds of the sale of the FLAC stock to Citizens in satisfaction of the Citizens-Debtor Loan. The question posed by this litigation is whether the Payment Agreement is enforceable when the situation at the time of the sale of the stock was materially different from that contemplated when the loan workout was negotiated. The parties did not contemplate that the value of the FLAC stock would be less than the amount owed to Citizens, that the original collateral for the Citizens-Debtor Loan would become valueless, that the Debtor would file for bankruptcy relief, or that the holders of the purported participation interests in the BCA-Debtor Loan would object to the substitution of collateral.

Citizens presses a number of arguments to support its claim of entitlement to the FLAC sale proceeds. First, it claims the evidence was not sufficient to show BCA made a loan in any amount to the Debtor, so the Debtor's grant of a security interest to BCA in the FLAC stock did not attach. Second, it contends the Defendants do not have standing to make a claim to the FLAC proceeds because only the lead lender — BCA — had standing to do that. Third, it argues the Payment Agreement provided that it should receive the FLAC sale proceeds. Fourth, it claims BCA needed no authority to enter into the Payment Agreement because (a) it was not a fiduciary of the Defendants, (b) all four participation documents validly disclaimed any agency relationship, (c) the Defendants failed to prove the existence of an agency relationship, and (d) the four participation

24

documents created at most a negative covenant that BCA would not grant superior rights in the FLAC sale proceeds to a third party. Fifth, Citizens contends the three Participation Certificates are not true participations but must be recharacterized as mere loans to BCA. Sixth, it argues the Participation Certificates granted at most some form of security interest in BCA's security interest in the FLAC stock, and Security First, Southern Fidelity, and Northern Capital all failed to perfect a security interest in any of BCA's assets. Seventh, the bank claims Security First cannot rely on any provision in its Participation Certificate because it did not sign the certificate until after BCA had already agreed to give the FLAC sale proceeds to Citizens. Eighth (and finally), Citizens claims if the Court were to determine any of the Defendants were entitled to recover any of the FLAC sale proceeds, their recoveries should be limited to their respective pro rata shares in BCA's loan to the Debtor.

In response, the Defendants first argue the Commercial Loan Agreement by itself constituted BCA's binding commitment to extend credit, all that is required under the Kansas UCC for BCA to have given "value" as required to create an enforceable security interest in the FLAC stock. Second, they claim the recital in the Stock Pledge and Security Agreement that it was given to secure payment of a $12.382 million loan constituted a *prima facie* showing that the loan was made, and Citizens failed to present evidence to overcome that showing. Third, they contend additional evidence shows the loan was made. Fourth, they argue Citizens' argument that the Participation Certificates are not true participations is a red herring because the Certificates undoubtedly assigned

25

BCA's security interest in the FLAC stock to the three Defendants who received them. Fifth, they claim the Participation Certificates are true participations because the Defendants who purchased them were subject to a real risk of loss in the event the Debtor defaulted on the loan. Sixth, they argue BCA's lien on the FLAC stock has priority over Citizens' lien either because it was perfected first when Baranowski took possession of the stock, or because the Escrow Agreement declared BCA's lien to have such priority. Seventh, the Defendants contend the Payment Agreement does not reflect either a subordination agreement or an unconditional promise to pay the FLAC proceeds to Citizens, but instead a proposal to pay Citizens only if other suitable collateral that was securing the Citizens-Debtor Loan could be substituted for the FLAC stock. Eighth, they ask the Court either to award all the FLAC proceeds to them or to award them each a pro rata share of the proceeds based on the share of the loan that BCA sold them. In response to Citizens' post-trial brief, the Defendants add a claim that several of the issues Citizens addressed in its brief were not properly preserved for trial.

The Court will not address all these issues, but only those necessary to its decision.

**B. BCA's security interest in the FLAC stock attached since, contrary to Citizens' position, the evidence shows value was given for the Debtor's grant of a security interest to secure the BCA-Debtor Loan.**

The Court will first consider Citizens' argument that neither BCA nor any of the Defendants have an enforceable security interest in the FLAC stock or its proceeds because the security interest granted to BCA by the Debtor did not attach under Article 9 of the Uniform Commercial Code (UCC). Section 9-203(b)(1) of the UCC provides "a

26

security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . value has been given."[8]  Value is defined by UCC § 1-204 as follows:

> Except as otherwise provided in articles 3 and 4 of chapter 84 of the Kansas Statutes Annotated, and amendments thereto, a person gives value for rights if the person acquires them:
>
> (1) In return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection;
>
> (2) as security for, or in total or partial satisfaction of, a preexisting claim;
>
> (3) by accepting delivery under a preexisting contract for purchase; or
>
> (4) in return for any consideration sufficient to support a simple contract.[9]

The linchpin of Citizens' argument that there is no evidence that value was given is the failure of the Defendants to produce a copy of the Note between BCA and the Debtor. But a quick review of the foregoing definition of value in light of the evidence in this case shows that such failure is not fatal to the attachment of BCA's lien.

The term "value" includes a "binding commitment to extend credit . . . whether or not drawn upon."  The Commercial Loan Agreement between BCA and the Debtor constituted a commitment to extend credit.  Further, as set forth in detail in the findings of

---

[8]K.S.A. 2011 Supp. 84-9-203(b)(1).

[9]K.S.A. 2011 Supp. 84-1-204.

27

fact, the Court is convinced by the evidence that funds were advanced in accord with the Commercial Loan Agreement and a loan of approximately $12 million was made by BCA to the Debtor.

### C. Citizens is entitled to the proceeds of the FLAC stock under the terms of the Payment Agreement.

The Payment Agreement provides that the Debtor and BCA shall pay to Citizens all proceeds they are entitled to receive from the sale of the FLAC stock to the extent necessary to satisfy the amount then due on the Citizens-Debtor Loan, and the evidence at trial showed the parties did not intend to leave open the possibility that anyone other than BCA or the Debtor might be entitled to receive those proceeds. The Court finds that the Payment Agreement is in effect a subordination agreement, under which BCA agreed upon the sale of the FLAC stock to subordinate its first lien in the proceeds to Citizens' second lien in the same collateral. Such agreements are authorized by § 9-339 of Article 9 of the UCC, entitled "Priority Subject to Subordination."[10] It provides, "This article does not preclude subordination by agreement by a person entitled to priority." Agreement is defined in UCC § 1-201(3) to mean "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of

---

[10] The Payment Agreement states that Missouri law governs it; § 9-339 has been adopted in Missouri. Mo. Ann. Stat. § 400.9-339 (West 2003); *see In re Dial Business Forms, Inc*., 273 B.R. 594 (Bankr. W.D. Mo. 2002), *aff'd* 283 B.R. 537 (8th Cir. BAP 2002), *aff'd* 341 F.3d 738 (8th Cir. 2003). Kansas has adopted exactly the same provision. K.S.A. 2011 Supp. 84-9-339.

Case 08-06132    Doc# 232    Filed 10/05/12    Page 28 of 42

dealing or usage of trade or course of performance."[11]  In other words, the fact that the

Payment Agreement does not use the words "subordinate" or "subordination" is not

controlling.  The evidence establishes there was an agreement among Citizens, BCA, and

the Debtor to subordinate BCA's first lien position in the proceeds of the sale of the

FLAC stock to Citizens' second lien position.

The Court rejects any contention that the Payment Agreement should not be

enforced because the economic underpinnings to the workout agreement did not occur.

Based on all the evidence presented, it is clear that BCA and the Debtor agreed to give

Citizens the proceeds of any sale of the FLAC stock to avoid defaulting on the Citizens-

Debtor Loan because they believed the economics were such that:  (1) a sale would

happen fairly soon, thereby providing a basis for a short-term extension of Citizens' note;

(2) Citizens would be paid off and release its lien on the collateral securing the Citizens-

Debtor Loan; and (3) that collateral could then be substituted for the FLAC stock as

collateral for the BCA-Debtor Loan.  But as examined in the findings of fact, nothing

presented at trial suggested Citizens agreed these economic underpinnings were

conditions to the obligation to give it the FLAC proceeds.  The testimony does not

support the existence of such conditions, and the Workout Documents included only the

Debtor's and BCA's unconditional agreement to give Citizens the sale proceeds.  The

Workout Documents reflected the settlement offer recited in Citizens' letter of June 19,

---

[11]Mo. Ann. Stat. § 400.1-201(3) (West 2012 electronic update).  K.S.A. 2011 Supp. 84-1-201(3) contains essentially the same definition.

2008, which was accepted by the Debtor and Brooke Corporation, BCA's majority owner, by a letter dated June 20, 2008, and this correspondence included none of the conditions concerning value and substitution of collateral which had been in earlier correspondence from the Debtor and BCA. There is no integration clause in the Payment Agreement, but the record convinces the Court that the parties did not intend for their written documents to be supplemented by additional terms making the turnover of the proceeds conditional depending on the economics of the transaction at the time of the sale of the FLAC stock.

The Court finds that the Payment Agreement is enforceable against the Debtor notwithstanding its filing for relief under the Bankruptcy Code. The parties have not argued that the Debtor's seeking relief under Title 11 provides a bar to the enforcement of the Payment Agreement. The Trustee of the Debtor when answering the complaint did not raise any bankruptcy-related defenses[12] and was dismissed from this proceeding because he did not assert any claim or interest in the FLAC proceeds.[13] The Code, in § 510(a), expressly preserves the effect of subordination agreements in bankruptcy proceedings. It provides, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." The Court therefore finds that the Payment Agreement is

---

[12]Dkt. 60. For example, there was no contention that Citizens was seeking to enforce an executory contract of the Debtor which had not been assumed.

[13]Dkt. 151.

enforceable against the Debtor.

Citizens' claim against the Debtor is secured by a lien in the FLAC proceeds which is superior to the lien of BCA in the same collateral. Therefore, Citizens is entitled to the FLAC proceeds, unless the Defendants as holders of participation interests in the BCA-Debtor Loan have superior claims. This issue is examined next.

### D. Does the Payment Agreement grant Citizens an entitlement to the sale proceeds which is superior to the claim of the Defendants as holders of participation interests in the BCA-Debtor loan?

If, as they claim, the Defendants are the holders of participation interests in the BCA-Debtor Loan, their claim to the FLAC proceeds is derivative of BCA's claim. As such holders, the Defendants contend that under the participation documents, BCA had no authority to subordinate their interests in the proceeds of the sale and, therefore, their right to their proportionate share of the FLAC proceeds is superior to Citizens' claim. In response, Citizens argues the Participation Certificates and the Participation Agreement must be recharacterized as loans to BCA, rather than participations in the BCA-Debtor Loan. Under this view, BCA's authority to subordinate its interest in the proceeds was not impaired by the existence of participants in the BCA-Debtor Loan, and these Defendants are creditors of BCA, not the Debtor, so that if they have an interest in the FLAC stock, that interest would have to have been granted to them by BCA, not the Debtor.

### 1. Because the Participation Certificates must be recharacterized as loans to BCA, rather than true participations in the BCA-Debtor Loan, the Defendants holding those certificates are not holders of perfected security interests in the

31

*FLAC proceeds.  As to these Defendants, whether the Participation Certificates impacted BCA's authority to subordinate its security interest in the FLAC proceeds is a moot issue.*

When denying Citizens' motion for summary judgment, the Court thoroughly examined the case law defining the characteristics of true loan participations and when a transaction documented as a loan participation should be recharacterized as a loan from the participant to the lead lender.[14]  That analysis will not be repeated here.  As noted in the prior ruling and confirmed by the foregoing findings of fact following trial, the Participation Certificates contain many provisions commonly found in true participations.  But from the Court's prior study of relevant case law, it has concluded that in cases considering whether financial transactions are true participations or disguised loans, the most important question is whether the alleged participant is subject to the risk of loss resulting from default by the underlying borrower.[15]  If the participant is not subject to that risk, the transaction is a loan to the participation seller, not a participation in the seller's loan to its borrower.  For example, in the cases ruling a purported participation was actually a disguised loan to the seller, the purported participation seller was to pay the participants even if the borrower did not pay the seller,[16] the participants were to be

_____

[14]Dkt. 200.

[15]*See, e.g., In re the Woodson Company*, 813 F.2d 266, 271-72 (9th Cir. 1987) (fact participation seller relieved alleged buyers of "all risk of loss" was most significant fact leading to finding participations were actually loans to seller).

[16]*Woodson Company*, 813 F.2d at 271; *European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 934-35 (Bankr. S.D.N.Y. 1993) (fact participant was to be paid before seller was one factor leading court to deny summary judgment on participant's claim participation could not be treated as loan to seller); *In re Coronet Capital*, 142 B.R. 78, 80-81 (Bankr.

paid before the seller from the loan payments or from collections after the borrower's default,[17] the seller was to pay the participants if the borrower defaulted,[18] the seller or its officers or other insiders guaranteed repayment of the participants' investments,[19] or the seller bought insurance that would pay the participants if the seller failed to.[20]

In this case, BCA initially promised to repurchase the Defendants' interests in the Participation Certificates in ninety days, and that period was extended in the amendments to the agreements. The evidence convinces the Court that the repurchase obligations were material terms of the agreements between BCA and the three participants. The promise to repurchase is a promise that is similar to a guarantee that the participants will be repaid by the lead lender.

In addition, an affiliate of BCA and the Debtor — Aleritas — gave the Defendants more substantial guarantees for their Participation Certificates: if the Debtor defaulted, Aleritas would give them credit on loans they owed it for the amount they paid for their shares of the BCA-Debtor Loan. Aleritas would not have to produce actual cash to fulfill such a promise, but could do so with simple book entries, making its performance of the promise more certain than a promise to repay them in cash would have been. In other

---

S.D.N.Y. 1992).

[17]*Sackman Mortgage Corp.*, 158 B.R. at 934-35; *Coronet Capital*, 142 B.R. at 81.

[18]*Woodson Company*, 813 F.2d at 271.

[19]*Sackman Mortgage Corp.*, 158 B.R. at 934; *Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc. (In re S.O.A.W. Enterprises, Inc.)*, 32 B.R. 279, 282-83 (Bankr. W.D. Tex. 1983).

[20]*Woodson Company*, 813 F.2d at 268 and 271.

33

words, the holders of the Participation Certificates were not relying solely on the Debtor

to repay them. Consequently, the Participation Certificates must be treated as loans to

BCA, and not true participations in the BCA-Debtor Loan.[21]

While true loan participants are allowed to rely on their lead lender's perfection of

security interests to protect their interests,[22] purchasers of participations that are

recharacterized as loans to the lead are not entitled to rely on that perfection. Instead, like

a lessor whose "lease" is determined to be a disguised secured transaction,[23] such

participants' interests are unperfected if they took no steps independent of the lead to

perfect the interests.[24] Further, if a security interest in the FLAC stock was granted to

---

[21]Citizen's motion for summary judgment on the recharacterization issue was denied by the Court in an opinion signed on January 20, 2011. Dkt. 200. As to the Defendants holding Participation Certificates, the Court concluded they "appear to have been subject to at least some of the risk the Debtor might default on the underlying loan." *Id*. at 21. The Court's present decision finding recharacterization is not inconsistent with the prior ruling. When ruling on the summary judgment motion, the evidence concerning the extension of the time period for repurchase was not considered. Also, the agreements with Aleritas, which the Court finds very significant, were not included in the summary judgment materials presented to the Court.

[22]*See, e.g., Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 740-44 (6th Cir. 2001); *see also* K.S.A. 2011 Supp. 84-9-502(a)(2) (financing statement must provide name of secured party or representative of secured party) and 84-9-503(d) (failure to indicate representative capacity of secured party or representative of secured party does not affect sufficiency of financing statement); 1 Barkley Clark & Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 2.09[2] at p. 2-114 (3d ed. A.S. Pratt 2012).

[23]*See* 1 Clark & Clark, *Secured Transactions Under the U.C.C.*, ¶ 1.05.

[24]*See Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc. (In re S.O.A.W. Enterprises, Inc.)*, 32 B.R. 279, 283-86 (Bankr. W.D. Tex. 1983) (so-called "participation" agreement recharacterized as loan and participant determined to be unperfected secured creditor of participation); *see also* Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 Tenn. L. Rev. 519, 530-31 (1984) (where sale of participation is regarded as sale of accounts or chattel paper, sale is subject to Article 9 of the UCC, and purchasing bank would appear to be required to make UCC filing to have perfected security interest that is valid against creditors of selling bank).

34

them by BCA under the Certificates,[25] the Defendants who invested in the Participation Certificates took no steps on their own to perfect their interests in the FLAC stock. Therefore, these three Defendants are not holders of perfected security interests in the FLAC proceeds granted to them by BCA.

The Court holds that whether the Participation Certificates impacted BCA's freedom to subordinate its interest in the FLAC proceeds is a moot issue. The right to the proceeds is a priority dispute between the holders of perfected security interests. The three Defendants had at most unperfected security interests in the FLAC stock, so whether BCA's perfected security interest could be subordinated without these Defendants' consent has no bearing on the outcome of the controversy.

### 2. Because the Participation Agreement held by Bank of Kansas is a true participation and the Participation Agreement required the bank's written consent to subordination, which was not given, Citizens' claim to the proceeds is subject to the superior claim of Bank of Kansas to 14.54% of the proceeds.

When denying Citizens' motion for summary judgment on the recharacterization question, the Court concluded that "Citizens has pointed to nothing that would justify recharacterizing the Agreement as a loan, rather than a participation arrangement."[26] Likewise, the evidence at trial provides no basis for such a ruling. The terms of the Participation Agreement are those commonly found in such arrangements. Unlike the three Participation Certificates, the Participation Agreement did not obligate BCA to

---

[25]The Court makes no ruling about the specific property in which the three holders of the Participation Certificates were granted security interests under the recharacterized certificates.

[26]Dkt. 200 at 22.

repurchase the participating bank's interest and neither Aleritas nor any other Brooke entity agreed to make accommodation if the Debtor defaulted on the BCA-Debtor loan.

The Court must therefore consider whether BCA's subordination of its first lien in the FLAC proceeds is binding upon Bank of Kansas, who was not a party to the Payment Agreement. Generally, a subordination agreement is not binding upon persons who are not parties to the agreement. As stated in the Official Comment to UCC § 9-339, "Only the person entitled to priority may make such an agreement: a person's rights cannot be adversely affected by an agreement to which the person is not a party."[27]

Citizen's contends that BCA was granted authority in the Participation Agreement to subordinate the lien securing Bank of Kansas' interest in the BCA-Debtor Loan without the bank's consent. In a case involving the construction of participation agreements, the Kansas Court of Appeals described the law governing such agreements this way:

> The rights of the participant bank flow not from the participation relationship itself but from the express terms of the specific agreement. [Citations omitted.] The parties to a participation agreement may contract to whatever terms they wish. Any such contract will generally be enforced as to its terms. Authorities state that a participating bank wanting control over decisions affecting modification or collection of loans, or seeking a right to demand repurchase by the lead bank, must explicitly provide for that control in the participation agreement. [Citation omitted.][28]

The court went on to rule that where the only documents executed by a lead bank and two

---

[27]This Comment appears in both the Missouri and Kansas versions of § 9-339.

[28]*First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 790, 758 P.2d 236, 238 (1988).

36

participating banks contained nothing either limiting the lead bank's power to extend the due date on the underlying loan or giving the participating banks any right to excuse themselves from the loan, the lead bank did not violate any duty to the participating banks by granting an extension of the loan over the objection of one of the participating banks.[29] Under Kansas law, then, the Court must review the Participation Agreement in order to determine whether it gave BCA the authority to agree to give the FLAC sale proceeds to Citizens.

Section 12.1 of the Participation Agreement provides:

> Subject to the provisions of Section 19, Seller may administer the Loan and any related security and guaranties as though it were the sole owner and holder thereof. Except as otherwise provided herein and as provided in Section 19, Seller will make all decisions concerning the servicing of the Loan and any related security and guaranties, acceleration, foreclosure, acquisition of other security or guaranties, deficiency judgments, and administration and disposition of acquired security. Seller will not, without Purchasers' written consent, reduce principal or interest with respect to the Loan or release or allow for the substitution of any security outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan.[30]

The reference to Section 19 concerned default and liquidation of the BCA-Debtor Loan, but none of the parties have argued Section 19 has any impact on the Court's decision. The question is therefore whether BCA's agreeing to the workout with Citizens and the Debtor required the participant's written consent because it was an agreement to "release

---

[29] *Id.*, 12 Kan. App. 2d at 790-93, 758 P.2d at 238-240.

[30] Exh. 11.

or allow for the substitution of any security outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan."

To the extent the Payment Agreement is not supplemented by the economic underpinnings assumed by the Debtor, as found by the Court when holding that Citizens is entitled to the FLAC proceeds, there is no question that the written consent of the participant was required. There is no evidence that the Payment Agreement was in BCA's normal course of dealing with the Debtor. Also, performance of the subordination agreement without a substitution of collateral would substantially reduce the possibility of repayment to Bank of Kansas.

The question is closer if the agreement to substitute collateral is also considered as part of the workout transaction. However, even then there is no evidence that a release of collateral followed by a substitution was in the normal course of BCA's dealings with the Debtor. The phrase "normal course of dealing" often is used in discussions of the ordinary course of business exception to preferential transfers actions under § 547(c). In that context, the phrase refers to the history of transactions between the defendant and the debtor.[31] That same meaning is a reasonable interpretation of the Participation Agreement. But the record is devoid of evidence that the Debtor and BCA had a history of substituting collateral. Further, although initially it was anticipated that the subordination coupled with the substitution would not reduce the security for the loan,

---

[31] *E.g., In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

that turned out not to be the case. If the subordination is enforceable against Bank of Kansas, its recovery under its Participation Agreement will be reduced.

The Court therefore finds that BCA's agreement with Citizens and the Debtor to subordinate the priority of its security interest in the FLAC proceeds was outside the normal course of BCA's dealing with the Debtor and substantially reduced the possibility of payment. Written consent by the participant was required. Since such consent was not obtained, the subordination provided for in the Payment Agreement is not binding upon Bank of Kansas.

Bank of Kansas is the owner of a 14.54% participation interest in the BCA-Debtor Loan. The Participation Agreement assigned to Bank of Kansas a security interest in the collateral for the BCA-Debtor Loan, which included the FLAC stock, in proportion to the bank's interest in the loan. It also provided that the participant's interest in all payments under the note would be pro rata based on the participant's percentage share. Therefore, absent subordination, the bank would have been entitled to 14.54% of the proceeds received by BCA from the sale of the FLAC stock.[32] Since the subordination agreed to in the Payment Agreement is not binding on Bank of Kansas because it did not consent, it remains entitled to 14.54% of the proceeds, even though the remainder is payable to Citizens.

**E. Under the circumstances of this case, the Court declines to follow those courts that have ruled the holder of a true participation interest has no standing to**

---

[32]*See Peoples Nat'l Bank v. Purina Mills, Inc.*, 931 F. Supp. 1525, 1529, 1533 (D. Kan. 1996).

39

**enforce its rights against the property of the underlying borrower in the
participation transaction.**

Having concluded Bank of Kansas holds a true participation interest in the BCA-

Debtor loan which BCA could not validly subordinate to Citizens' claim, the Court must

address Citizens' argument that a participant like Bank of Kansas has no standing to

assert its claim against the Debtor's property. As the Tenth Circuit said in *Hibernia*

*National Bank v. FDIC*,[33]

> In a typical participation, the "lead" (Penn Square) divides loans into shares
> which it then offers for sale to other participating financial institutions
> (Hibernia). The lead is the only secured party. The "participants" can look
> solely to the lead for satisfaction of their claims because they are not
> themselves creditors of the borrowers and cannot assert creditor claims
> against the borrowers.

But the Court believes the general rule stated in *Hibernia* that only the lead can assert a

claim against the underlying borrower is concerned with activities that subject the

borrower to conflicting claims, such as a participant making direct contact with the

borrower in an effort to collect its share of the loan while the lead bank is still trying to

enforce the full amount of the loan.[34] In *Hibernia*, the lead bank, not the borrower, had

become insolvent and the FDIC was appointed receiver for it.[35] The participant began

contacting the borrowers directly in an effort to collect from them, and sued the FDIC

---

[33]733 F.2d 1403, 1407 (10th Cir. 1984).

[34] The Court also notes that the participation transactions involved in this case are far from
"typical." The lender, BCA, was not a financial institution involved in the banking business. Even more
striking, it was not an independent lender, but a subsidiary of its borrower, the Debtor.

[35]733 F.2d at 1404.

seeking an injunction to bar some actions it was taking with respect to the borrowers.[36]

Here, Bank of Kansas is asserting its claim against the FLAC stock within the confines of the Debtor's bankruptcy case, a much different circumstance. In this situation, the Court agrees with a commentator that in the context of the bankruptcy of the underlying borrower, the loan participant should have a direct claim in the bankruptcy and not be relegated to pursuing the lead lender.[37] At least one court has allowed a loan participant to assert a lien in a bankruptcy case on the proceeds of the bankruptcy trustee's sales of the debtor's personal property.[38] While this might subject the bankrupt borrower to conflicting claims from the lead lender and the participants, the borrower will be protected by the bankruptcy court's supervision and resolution of the claims. In this case, however, the Debtor and BCA have already declined to assert any claim to the FLAC proceeds, so there is no danger of claims based on the BCA-Debtor Loan being asserted that seek to recover from the Debtor more than the full amount it owes. The Court concludes that Bank of Kansas does have standing to assert its claim against the FLAC stock in this lawsuit.

### III. Conclusion

As explained above, the Court concludes Citizens' claim to the proceeds of the

---

[36]*Id*. at 1405-06.

[37]Bradford Anderson, "Loan Participations and the Borrower's Bankruptcy," 64 *Am. Bankr. L.J.* 39 (1990).

[38]*In re Fried Furniture Corp.*, 293 F.Supp. 92, 92-94 (S.D.N.Y. 1968).

41

sale of the FLAC stock is superior to the claims of the Defendants, except Bank of

Kansas.  Citizen's superior claim results from the Payment Agreement, which is in effect

a subordination agreement whereby BCA's first lien in the proceeds of the FLAC stock

would be subordinated to the second lien of Citizens in the same collateral when the

FLAC stock was sold.  The subordination agreement is enforceable in bankruptcy.  The

Participation Certificates must be recharacterized as loans to BCA, rather than

participations in the BCA-Debtor Loan.  The three holders of the Participation

Certificates failed to perfect any security interest which may have been granted to them

by the recharacterized agreements, so whether as to these Defendants the Participation

Certificates impaired BCA's authority to subordinate its security interest in the FLAC

proceeds is a moot question.  However, the Participation Agreement held by Bank of

Kansas is a true participation agreement not subject to recharacterization.  It precluded the

subordination of the lien securing the bank's participation interest without the bank's

written consent, which was not given.  Therefore, BCA's first lien position in the FLAC

proceeds is not subordinated as to the 14.54% interest of Bank of Kansas in the FLAC

proceeds.  Bank of Kansas is entitled to 14.54% of the net proceeds and Citizens is

entitled to the remainder.

**IT IS SO ORDERED.**

# # #

42